1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  JONATHAN A. ELDREDGE, Bar No. 238559
   One Walnut Creek Center
3  100 Pringle Avenue, Suite 500
   Walnut Creek, CA 94596
4  Telephone: (925) 210-2800
   Facsimile: (925) 945-1975
5
   Attorneys for Defendant
6  University of the Incarnate Word

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11 LEARNING TECHNOLOGY PARTNERS,  )   **Case No.**
   a California limited liability company,  )
12                                 )   **NOTICE OF REMOVAL OF ACTION**
                  Plaintiff,       )   **UNDER 28 U.S.C. § 1441**
13                                 )
       vs.                         )
14                                 )
   UNIVERSITY OF THE INCARNATE     )
15 WORD, a Texas nonprofit corporation, and  )
   DOES 1 through 10, inclusive,   )
16                                 )
                  Defendants.      )
17 _____ )

18 TO THE CLERK OF THE ABOVE ENTITLED COURT:

19         PLEASE TAKE NOTICE that pursuant to 28 U.S.C. section 1441, defendant

20 University of the Incarnate Word ("UIW") hereby removes to this Court the state court action

21 described below:

22         1.    On August 19, 2014, this action was commenced in the Superior Court of

23 the State of California in and for the County of San Francisco, entitled "*Learning Technology*

24 *Partners, a California limited liability company, v. University of the Incarnate Word, a Texas*

25 *nonprofit corporation, and Does 1 through 10, inclusive,*"  Case Number CGC-14-541242.  A

26 copy of the summons, complaint and other documents served on UIW is attached as **Exhibit A**.

27         2.    UIW was formally served with the complaint and summons on August 27,

28 2014.

3.    The complaint alleges that UIW has breached an agreement with LTP, and seeks damages and injunctive relief.

## JURISDICTION

4.    This action is removable to this Court pursuant to the provisions of 28 U.S.C. section 1441:

(a)    This Court has original jurisdiction over this action under 28 U.S.C. section 1332, in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs:

(i)    Plaintiff is a California limited liability company with its principal place of business in Walnut Creek, California.  (*See* Complaint, ¶ 2.)  Plaintiff's managing member is a citizen of California residing in Alamo, California.  Plaintiff's other members are all California or non-Texas citizens.

(ii)    UIW is a Texas nonprofit corporation with its principal place of business in San Antonio, Texas.  (*See* Complaint, ¶ 3.)

(iii)    Plaintiff seeks "millions of dollars in unpaid fees and damages," as well as attorney fees and injunctive relief.  (*See* Complaint, ¶ 1and Prayer for Relief.)

## INTRADISTRICT ASSIGNMENT

5.    Pursuant to Northern District Local Rules 3-5(b) and 3-2(c) and (d), this case is properly removed to this division.

Dated: September 25, 2014

GLYNN & FINLEY, LLP
CLEMENT L. GLYNN
JONATHAN A. ELDREDGE
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA  94596


By    /s/ Jonathan A. Eldredge
Attorneys for Defendant
University of the Incarnate Word

# EXHIBIT A



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
University of the Incarnate Word, a Texas nonprofit corporation, and DOES 1 through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Learning Technology Partners LLC, a California limited liability company

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | CASE NUMBER:<br>*(Número del Caso):*<br>**CGC - 14 - 541242** |
|---|---|

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
County of San Francisco
400 McAllister Street
San Francisco, CA  94102-4515

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kenneth A. Kuwayti (Bar No. 145384) Tel.: 650.813.5600 Fax: 650.494.0792
MORRISON & FOERSTER LLP
755 Page Mill Road, Palo Alto, CA  94304-1018   CLERK OF THE COURT

DATE: **AUG 19 2014**          Clerk, by _____ ELIAS BUT , Deputy
*(Fecha)*                      *(Secretario)*              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|---|

SUMMONS ISSUED

**F I L E D**
Superior Court of California
County of San Francisco

AUG 19 2014

CLERK OF THE COURT
BY: _Chas Rot_
Deputy Clerk

1  KENNETH A. KUWAYTI (BAR NO. 145384)
   KKuwayti@mofo.com
2  JACOB MICHAEL KAUFMAN (BAR NO. 274594)
   JacobKaufman@mofo.com
3  MORRISON & FOERSTER LLP
   755 Page Mill Road
4  Palo Alto, California 94304-1018
   Telephone: 650.813.5600
5  Facsimile: 650.494.0792

6  Attorneys for Plaintiff
   LEARNING TECHNOLOGY PARTNERS

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN FRANCISCO

10                         UNLIMITED JURISDICTION

11  LEARNING TECHNOLOGY PARTNERS, a          Case No. CGC - 14 - 541242
    California limited liability company,
12
                                             UNLIMITED JURISDICTION
13                      Plaintiff,
                                             COMPLAINT FOR BREACH OF
14         v.                                CONTRACT

15  UNIVERSITY OF THE INCARNATE WORD, a
    Texas nonprofit corporation, and DOES 1 through
16  10, inclusive,                                **Jury Trial Requested**

17                      Defendants.

18

19

20         1.     This case arises out of defendant's blatant disregard of its contractual obligations

21  to pay plaintiff Learning Technology Partners LLC ("LTP") for online educational services.

22  Unbeknownst to LTP, for over two years, the defendant, University of the Incarnate Word

23  ("UIW"), has been both under-reporting the number of students to which it has been providing

24  access to LTP's online educational services, as well as under-reporting the services to which

25  those students have had access.  Defendant UIW was not only aware of this unauthorized activity,

26  but actively enabled and promoted it.  As a result of these, and other, breaches of contract and

27  wrongful conduct, defendant UIW now owes LTP millions of dollars in unpaid fees and damages.

28

pa-1656876                                1

1   UIW representatives have acknowledged that UIW owes LTP money for the unauthorized usage,

2   and have promised to pay for it.  However, to date UIW has not paid LTP any of the additional

3   money that LTP is owed.

### THE PARTIES

5       2.      Plaintiff LTP is an integration SaaS company dedicated to giving educational

6   institutions the technological means to compete successfully in the online education market.  It is

7   a California limited liability company, with its principal place of business at 1840 San Miguel

8   Drive, Suite 101, Walnut Creek, California.

9       3.      Defendant University of the Incarnate Word ("UIW") is an educational institution

10  which offers, among other things, online course instruction.  On information and belief, UIW is a

11  Texas nonprofit corporation, with its principal place of business in San Antonio, Texas.

12      4.      The true names or capacities, whether individual, corporate, associate, or

13  otherwise, of defendants named in this action as DOES 1 through 10, inclusive, are unknown to

14  plaintiff, who therefore sues these defendants by such fictitious names.  Upon information and

15  belief, plaintiff alleges that each of the fictitious defendants was in some manner responsible for,

16  participated in, or contributed to the events alleged in this complaint, and in some fashion has

17  legal responsibility for these events.  Plaintiff will amend this complaint, as appropriate, when the

18  exact nature and identity of the fictitious defendants who are responsible for participating in and

19  contributing to the events alleged in this complaint have been ascertained.

### JURISDICTION AND VENUE

21      5.      LTP and UIW commenced their business relationship pursuant to the Services

22  Agreement dated December 22, 2004 ("Services Agreement").  *See* attached Exhibit 1.

23      6.      At the time the Services Agreement was executed, LTP maintained its principal

24  place of business in San Francisco, California.

25      7.      As an educational institution with an extensive online curriculum, UIW offers its

26  online curriculum to students all over the world, including students residing, or otherwise located

27  in the state of California, and in the city of San Francisco, California.

28

8.     Section 13.4 of the Services Agreement provides: "Any action or proceeding arising from or relating to this Agreement may be brought in a federal court in the Northern District of California or in state court in San Francisco County, California, and each party irrevocably submits to the jurisdiction and venue of any such court in any such action or proceeding."

9.     Section 13.4 of the Services Agreement provides further: "This Agreement is governed by the laws of the State of California as such laws apply to contracts between California residents performed entirely within California."

## FACTUAL BACKGROUND

**Background To The Services Agreement**

10.     Pursuant to the Services Agreement, LTP has been providing UIW with access to its "IZIO" online learning platform since December 2004. IZIO is a robust Learning Management System ("LMS") developed at Stanford University, to provide school administrators, faculty and students with a single easy-to-use platform to manage all school-related activities. As a Content Management System ("CMS"), IZIO platform provides educational institutions with a suite of technologies used to manage all Teaching and Learning aspects of the institution's relationship with its students, from posting of course materials and announcements, to grading of exams.

11.     At UIW's specific request, LTP developed a front-end web portal to facilitate the process of students accessing IZIO, as well as to provide some additional functionality for UIW ("Web Portal"). The fees for the work by LTP to develop the Web Portal were waived as part of the discount of the initial set up fee (see Section 7.6 of Services Agreement below).

12.     The original term of the Services Agreement was for 3 years. UIW and LTP have renewed the Services Agreement three times, the first two renewals for additional 3-year terms, and most recently with a December 2013 addendum for a 1-year term to conclude on December 31, 2014. A copy of the December 2013 addendum is attached to this complaint as Exhibit 2.

13.     Under the terms of the Services Agreement, UIW agreed to pay LTP for each student who was granted access to IZIO as part of their course (see Services Agreement, Exhibit

1    A "Services and Fees," Section II). Over the past 10 years, LTP and UIW have agreed to various

2    increases in the IZIO fee; in the most recent amendment, the fee was increased to $24 per student

3    per 5-8 week course.

4         14.    Pursuant to the Services Agreement, the price-per-student for enrollment in a

5    course utilizing IZIO is a fixed fee and applies regardless of the amount of a student's usage of

6    IZIO. Thus, if any UIW student enrolls in a course utilizing IZIO, UIW owes LTP a flat $24

7    regardless of whether such student accesses IZIO every day during the semester or decides

8    thereafter to not access IZIO after enrollment. The parties have followed that billing practice for

9    over nine years.

10        15.    Towards the end of 2009, UIW asked LTP if it would make e-books available for

11   downloading to students in UIW's Adult Degree Completion Program ("ADCaP"). The parties

12   negotiated and agreed in writing that UIW would pay to LTP $2 for each ADCaP student who

13   accessed the Web Portal on a one-time basis to download their e-books, but that these ADCaP

14   students would not have access to IZIO. The parties referred to this new classification of users,

15   both in their discussions and for invoicing purposes, as "Click Through Usage."

16        16.    In July 2011, at UIW's request, the parties agreed in writing that students in a new

17   ADCaP "Blended" program would be provided access to IZIO. The parties agreed to a

18   discounted rate for certain services, which approximated $12, for each "blended student" enrolled

19   in a 5-8 week course. In the most recent addendum to the Services Agreement, the fee for each

20   "blended students" has been increased to $14, and the Web Portal access fee has been increased

21   to $4.

22   **ADCaP Students Begin Accessing LTP Services For Which UIW Has Not Paid**

23        17.    In late 2011, LTP began experiencing severe usage and capacity issues on its

24   network and systems. LTP made repeated inquiry of various persons at UIW, including

25   Dr. Cyndi Porter, UIW's Vice President for Extended Academic Programs, and later Dr. Marshall

26   Eidson, UIW's Vice President for Information Resources and Chief Information Officer, whether

27   something UIW or its students were doing, or permitting to be done, was placing this extra

28   burden on LTP's network and systems.

pa-1656876

4

18.     . UIW repeatedly denied that UIW and/or its students were taking any action that would result in capacity issues with LTP's network and systems.

19.     After significant time and expense, including upgrading its computer servers and expending hundreds of hours of labor (much of it overtime), LTP concluded that there were at least two distinct reasons, both attributable to UIW's overt actions, for the continuing strain on LTP's network and systems:

a.  **Enrollment into IZIO of ADCaP students for whom UIW had only paid the "Click Through Usage" fee**. UIW had been enrolling "Click Through Usage" students, who were not supposed to have access to IZIO, into classes UIW set up and structured through IZIO. LTP had not allocated capacity to handle these "Click Through Usage" students because UIW was not permitted under the Services Agreement to provide such students any access to IZIO. IZIO is a "turn key" product, and UIW had the sole ability to set up classes in IZIO and to provide its students the necessary information and grant the necessary permissions for them to access IZIO. These IZIO classes would not have existed, and the "Click Through Usage" students would not have been able to access IZIO, without the overt actions of UIW's administrators and faculty.

b.  **Enrollment into IZIO of ADCaP students for twice the amount of time for which UIW was paying.** From the second "Fall" semester of 2011 through the second "Spring" semester of 2014, UIW represented that only "blended students" were accessing IZIO and that they were only accessing it for one 5-8 week class per semester. LTP learned that all ADCaP students (both "blended" and Click-Through Usage students) were granted access to IZIO for 10-16 week courses for each semester during the above-referenced period. This includes courses that were set up in IZIO and taught by Mr. Vincent Porter, Dean of the School of Extended Studies (and Dr. Cyndi Porter's husband). Again, LTP was not contractually obligated

pa-1656876

COMPLAINT FOR BREACH OF CONTRACT

1    to provide this additional usage, nor had it prepared for the capacity issues

2    associated with an overlap of semesters.

3        20.    LTP's suspicions of improper behavior by UIW were reinforced by an email

4    conversation in April, 2013. Dr. Eidson wrote in an email dated April 22, 2013 to Dr. Porter,

5    copying LTP: "I must tell you that as the "CIO" of the university, I find it mind blowing that I do

6    not have any insight into the technical issues, support, etc., for a system [IZIO] that is relied upon

7    by quite a large number of students."

8        21.    Dr. Porter's response to Dr. Eidson's email above, which was sent to Reda

9    Athanasios, LTP's President, but was not sent to Dr. Eidson, only further heightened LTP's

10    suspicions: Dr. Porter's response stated: "You all [LTP employees] need to start being careful

11    what you share [with Marshall]. Why aren't you [LTP] using a virtual server system? Write me

12    [making a request of Mr. Athanasios] so I have it when he [Marshall] hits me with it."

13        22.    Based upon both computer data conclusively demonstrating that the unauthorized

14    users and usage came from UIW locations, as well as the above communication and other

15    communication from Dr. Porter which requested that LTP withhold or limit its conversations with

16    the Dr. Eidson and his staff, LTP began to document the unauthorized users and usage for UIW

17    and request that UIW compensate LTP.

18        23.    UIW initially refuted the evidence, including the computer data. However, UIW

19    representatives later acknowledged on numerous occasions that UIW owes LTP for this

20    unauthorized and uncompensated usage. For example, on February 20, 2014, Dr. Porter wrote an

21    email to Mr. Athanasios, stating: "We have said that we will pay you for the courses that people

22    in effect online course. We can call them rogue courses. They have been reprimanded and we

23    will pay you for an online course for them. I just need to see the accounting."

24        24.    In subsequent discussions between Mr. Athanasios and Mr. Douglas Endsley,

25    UIW's V.P. for Business & Finance, Mr. Endsley wrote an email dated June 3, 2014 in which he

26    admitted that UIW owed fees to LTP for past services utilized by UIW for ADCaP. The email

27    requested that LTP issue an invoice to UIW that would "detail the enrollments and level of

28    service and billing that applies to the [unauthorized] enrollments."

25.     Although LTP sent UIW an accounting of the unpaid enrollments and usage, UIW has not paid LTP any of this amount to LTP.

## FIRST CAUSE OF ACTION

(Breach of Contract)

26.     Plaintiff realleges and incorporates herein by this reference as though more fully set forth the allegations contained in paragraphs 1 through 25 hereof.

27.     Plaintiff has complied with all of its obligations under the Services Agreement.

28.     Notwithstanding LTP's compliance, and the fulfillment of all conditions necessary for UIW's performance, UIW has breached the contract in at least the following ways.

**Breach of Section 5.1 of Services Agreement**

29.     Section 5.1 of the Services Agreement states in pertinent part: "Client shall pay LTP all fees for the Core Services in accordance with the applicable fee schedule set forth in Exhibit A."

30.     Exhibit A of the Services Agreement set forth a detailed schedule of payments required by various users of the system for the Core Services (as defined in the Services Agreement), as amended by the parties from time to time.

31.     UIW has not been paying LTP the agreed upon rate for all of the UIW students who have been using IZIO.

32.     In addition, UIW students have been using IZIO in an unauthorized manner, and for twice the 5-8 week period agreed upon. UIW has not paid LTP for this unauthorized and extended usage.

**Breach of Sections 8.1 and 13.8 of Services Agreement**

33.     Section 8.1 of the Services Agreement, entitled "Client Representations and Warranties" states: "Client [UIW] represents and warrants to LTP that Client will use diligent efforts to ensure that its network and systems do not compromise the security or functionality of the systems used to provide the Services, whether by transfer of viruses or other harmful code, requests for service, or otherwise. Client agrees that, in the event its network and systems

1  compromise the security or functionality of the systems used to provide the Services, Client shall

2  use its best efforts to assist LTP to mitigate and restore any losses that may be incurred."

3      34.    By allowing, and facilitating, unauthorized students to access IZIO without LTP's

4  knowledge or permission, UIW did not use diligent efforts to ensure that LTP's system would not

5  be compromised by unauthorized "requests for service."

6      35.    UIW knew or should have known that many of its students were using IZIO in an

7  unauthorized manner, and that other students who were not authorized to use IZIO were in fact

8  using it, and that both the unauthorized usage and users were not being included in the payment

9  of fees by UIW to LTP.

10     36.    The functionality of LTP's systems was severely impacted by this unauthorized

11  and undisclosed usage.

12     37.    In addition, Section 13.8 of the Services Agreement states: "Client is responsible

13  for all uses of Software whether or not authorized by Client….Client agrees to immediately notify

14  LTP of any unauthorized use of Client's account of which Client becomes aware."

15     38.    UIW was solely responsible for designing its own courses, including the length of

16  each course, for admitting its own students, and for distributing information to its students on

17  how to access IZIO and the Web Portal.  LTP had no involvement with entering enrollment or

18  course information into IZIO, or communicating with enrolled students.

19     39.    Both Dr. Porter and Mr. Endsley have acknowledged in writing that IZIO was

20  improperly used and that UIW owes LTP additional fees.

21     40.    UIW did not immediately inform LTP of unauthorized users / uses as required by

22  Section 13.8.

23  **Breach of Section 7.6 of Services Agreement**

24     41.    Section 7.6 of the Services Agreement states in its entirety:  "Client acknowledges

25  and agrees that LTP will incur significant costs in initializing the relationship with Client,

26  including initial setup fees and custom work charges. In addition, LTP is providing a discount

27  exceeding sixty percent (60%) of its standard fees. As a consideration for LTP agreeing to waive

28  its setup fees and custom work charges, and providing such discount, Client agrees that for the

pa-1656876

8

1   term of this Agreement LTP shall be Client's sole and exclusive provider for all distance

2   education Content Management Systems or Learning Management Systems."

3          42.     On information and belief, UIW has previously employed, and continues to

4   employ, other Content Management Systems ("CMS") and/or LMS (i.e., Learning Management

5   Systems) related to online learning.

6          a.   Dr. Marshall Eidson, who on information and belief served as UIW's Vice

7               President for Information Resources and Chief Information Officer from

8               August, 2010 until October 2013, discusses UIW's use of a competitive CMS

9               and/or LMS called BlackBoard in a video posted on YouTube in 2011.  See

10              https://www.youtube.com/watch?v=i1h9OGTiFrk

11         b.   Mr. Endsley wrote a letter to LTP dated October 18, 2013 effectively admitting

12              that UIW has been making use of competing products, he stated that UIW

13              planned to replace IZIO with "other products that are paid for *and currently in*

14              *service in the greater part of the University."*  A copy of this letter is attached

15              to this complaint as <u>Exhibit 3</u>.

16         43.     UIW's use of other CMS and/or LMS during the term of the Services Agreement

17   is a breach of the exclusivity provision in Section 7.6.

18   **Breach of Section 4.3 of Services Agreement**

19         44.     Section 4.3 of the Services Agreement states in its entirety:  "Client [UIW]

20   acknowledges that the Software and its structure, organization and source code constitute

21   valuable trade secrets of LTP. Accordingly, Client agrees not to (a) modify, adapt, alter, translate,

22   or create derivative works from the Software; (b) merge the Software with other software; (c)

23   sublicense, lease, rent, loan, or otherwise transfer (except as explicitly provided in Section 3) the

24   Software to any third party, (d) reverse engineer, decompile, disassemble, or otherwise attempt to

25   derive the source code for the Software; or (e) otherwise use or copy the Software except as

26   expressly allowed under Section 3."

27         45.     UIW's concurrent use of LTP's Web Portal and IZIO and BlackBoard (and

28   possibly other competitive CMS and/or LMS) requires that "middleware" (software written to

1    bridge the functionality of two computer programs or systems) was written for and employed by

2    UIW.

3        46.    The writing, development and use of middleware violates Section 4.3 of the

4    Services Agreement in that, among other things, it is a derivative work in violation of Section

5    4.3(a), a merger in violation of Section 4.3(b), and a reverse engineering of LTP's software in

6    violation of Section 4.3(d).  It is also a violation of Section 4.3(e) because it is a usage in

7    violation of the exclusivity provision in Section 7.6 of the Services Agreement which is not

8    otherwise permitted under Section 3 of the Services Agreement.

9        47.    In addition, California law implies a covenant of good faith and fair dealing in all

10   contracts between parties entered into in the State of California that neither party will do anything

11   to deprive the other of the benefits of the contract.

12       48.    UIW breached that covenant of good faith and fair dealing by conducting itself in

13   a manner that deprived LTP of the benefits of the parties' agreement by, among other things,

14   allowing and facilitating the enrollment of UIW students in IZIO without paying LTP for those

15   services, and allowing and facilitating the use of IZIO by other software employed by UIW in an

16   undisclosed and unauthorized manner.

17       49.    As a proximate result of UIW's multiple breaches of the Services Agreement, LTP

18   has been significantly harmed and has incurred substantial damages, in an amount to be proven at

19   trial.  These damages include, but are not limited to, LTP's loss of fees for services that were

20   agreed to by the parties, LTP's loss of fees for online educational services provided to UIW by

21   other providers in violation of the exclusivity provision in Section 7.6 of the Services Agreement,

22   and all discounts provided to UIW, whether at the initial set up and installation, or reduced fees

23   during the entirety of the term of the Services Agreement, in exchange for exclusivity which LTP

24   has not in fact received, as detailed in Section 7.6 of the Services Agreement.  LTP's damages

25   further include damages from UIW's unauthorized and undisclosed uses of IZIO, and UIW's

26   failure to timely inform LTP of these uses which include, without limitation, costs to upgrade

27   LTP's servers and additional hours of labor to investigate unauthorized users and usage by UIW

28   students and faculty.

50.     In addition, LTP is entitled to injunctive relief to prevent further breaches of the Services Agreement from occurring.  Section 11.1 of the Services Agreement provides that upon any breach of the Services Agreement, including a breach of Section 7, the non-breaching party may seek injunctive relief, stating:  "Each party acknowledges that a breach of this Agreement, including any breach of Section 7, would result in irreparable harm to the non-breaching party. Accordingly the parties agree that in the event of a breach of this Agreement, the nonbreaching party shall be entitled to apply to a court of appropriate jurisdiction for injunctive relief to prevent or stop harm to the non-breaching party, including harm relating to any Intellectual Property Rights of the non-breaching party."

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants as follows:

a.     For general and special damages in the amount to be proven at trial;

b.     For reasonable attorneys fees and costs of suit, as provided by Section 11.2 of the Services Agreement, as the Court may deem proper;

c.     For interest at the lesser of 18% per annum, as provided by Section 5.2 of the Services Agreement, or the maximum rate provided for by law;

d.     For preliminary and permanent injunctive relief; and

e.     For such other and further relief as the Court may deem proper.


Dated: August 19, 2014                KENNETH A. KUWAYTI
                                      JACOB MICHAEL KAUFMAN
                                      MORRISON & FOERSTER LLP


                                      By: _____
                                           KENNETH A. KUWAYTI

                                      Attorneys for Plaintiff
                                      LEARNING TECHNOLOGY
                                      PARTNERS

1

2  Plaintiff hereby demands a trial by jury.

3

4  Dated: August 19, 2014                    KENNETH A. KUWAYTI
                                             JACOB MICHAEL KAUFMAN
5                                            MORRISON & FOERSTER LLP

6

7                                    By:  _____
                                             KENNETH A. KUWAYTI
8
                                             Attorneys for Plaintiff
9                                            LEARNING TECHNOLOGY
                                             PARTNERS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



Universe1220

## SERVICES AGREEMENT

This SERVICES AGREEMENT ("Agreement") is made and entered into as of the Effective Date, by and between **University of the Incarnate World**, Universe Online, having offices at 4300 Broadway, San Antonio, TX 78209 ("Client") and Learning Technology Partners, having offices at 595 Market Street, Suite 1340, San Francisco, California, 94105 ("LTP").

WHEREAS, LTP is engaged in the business of developing and providing a hosted Web-Based Collaboration application for education, knowledge sharing and performance support consisting of certain LTP Software, and associated services described herein (collectively, the "Services"); and

WHEREAS, LTP desires to enter into an agreement with Client, and Client desires to enter into an agreement with LTP, whereby LTP will host the application for the Client and provide Services to facilitate Client's collaboration, performance support and knowledge sharing program(s).

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, the parties hereby agree as follows:

1.  **DEFINITIONS**

    1.1    **Effective Date:** the Effective Date shall be the date that the Client signs the Agreement.

    1.2    **Software:** the term Software shall mean LTP's Learning Platform ("IZIO")

2.  **SERVICES**

    LTP agrees to provide to Client the Core Services described in **Exhibit A** (the "Services"), subject to the terms and conditions set forth herein.  LTP shall be under no obligation to provide the Services on terms and conditions other than as set forth herein.

3.  **GRANT OF LICENSES**

    3.1    **License by LTP to Client.**

    Subject to the terms and conditions of this Agreement (including Client's obligation to pay the Fees), LTP grants to Client a non-exclusive, worldwide license to use the Software in executable code form and in accordance with applicable documentation for the sole purpose of accessing and using the Services.

Universe 1220
Client Initials: 

### 3.2    License by Client to LTP.

Client hereby grants to LTP a non-exclusive, non-transferable, royalty-free license to reproduce, distribute, perform and display any course materials or other content provided by Client to LTP for the purposes of providing the Services to Client.

### 3.3    Limited Trademark License.

Each party grants the other party hereunder a limited, non-exclusive, non-transferable, royalty-free license to use such party's trade name, logo, or trademarks for the purpose of marketing the Services. The content of any marketing materials making use of a party's tradename, logo, or trademarks will be subject to that party's prior written approval which shall not be unreasonably withheld. Each party will comply with the other party's trademark usage guidelines in using any trademark, trade name, or logo of the other party. Except as expressly authorized by this Agreement, neither party will make any use of the other party's trademarks, trade names, or logo.

## 4.    PROPRIETARY RIGHTS

### 4.1    Proprietary Rights of LTP.

As between LTP and Client, the Software shall remain the sole and exclusive property of LTP. Nothing in this Agreement shall be construed to grant Client any ownership right in, or license to the Software, except as provided in Section 3 of this Agreement. All materials, including, any computer software (in object code and source code form), script, programming code, data, information or HTML script developed by LTP or its suppliers, including any trade secrets, know how, methodologies and processes, shall be the sole and exclusive property of LTP, including without limitation all copyrights, trademarks, patents, trade secrets, and any other proprietary rights inherent therein and appurtenant thereto.

### 4.2    Proprietary Rights of Client.

All content provided by Client to LTP pursuant to this Agreement, including any course materials, computer software (in object code and source code form), script, programming code, data, information or HTML script, shall remain the sole and exclusive property of Client or its suppliers, including, without limitation, all copyrights, trademarks, patents, trade secrets, and any other proprietary rights inherent therein and appurtenant thereto.

### 4.3    Restrictions.

Client acknowledges that the Software and its structure, organization and source code constitute valuable trade secrets of LTP. Accordingly, Client agrees not to (a) modify, adapt, alter, translate, or create derivative works from the Software; (b) merge the Software with other software; (c) sublicense, lease, rent, loan, or otherwise transfer (except as explicitly provided in Section 3) the Software to any third party, (d) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for the Software; or (e) otherwise use or copy the Software except as expressly allowed under Section 3.

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: ___

## 5.    FEES, TAXES AND EXPENSES

### 5.1    Services Fees.

Client shall pay LTP all fees for the Core Services in accordance with the applicable fee schedule set forth in Exhibit A.  All such fees shall be referred to collectively as the "Fees."

### 5.2    Payment.

(a)    Unless otherwise provided by LTP, Client shall pay all Fees upon receipt of invoice.  All payments must be made in U.S. dollars and shall be due upon Client's receipt of invoice from LTP. Failure to pay LTP for said fees by invoice terms will result in temporary deactivation of Software until payment is received. The Fees exclude all applicable sales, use and other taxes and all applicable export and import fees, customs duties and similar charges, and Client will be responsible for payment of all such taxes (other than taxes based on LTP's income), fees, duties and charges, and any related penalties and interest, arising from the payment of the Fees or the delivery or license of the Software or Services to Client. Client will make all payments of the Fees to LTP free and clear of, and without reduction for, any withholding taxes; any such taxes imposed on payments of the Fees to LTP will be Client's sole responsibility, and Client will provide LTP with official receipts issued by the appropriate taxing authority, or such other evidence as LTP may reasonably request, to establish that such taxes have been paid.   LTP reserves the right to charge interest in the amount of eighteen percent (18%) per annum or the maximum rate permitted by applicable law, whichever is less, from the due date until paid with the exception of disputed fees.

(b)    In its sole discretion LTP may establish any lawful credit policies, payment terms, late payment charges and other such mechanisms for the facilitation of LTP's business.  LTP is not obligated to extend credit terms to any individual, group, or organization.

### 5.3    Taxes.

The Fees exclude all applicable sales, use and other taxes, and Client will be responsible for payment of all such taxes (other than taxes based on LTP's income), and any fees, duties, charges, penalties, or interest, arising from the payment of the Fees, the provision of the Services, or the license to the Software.

## 6.    MARKETING.

### 6.1    Publicity.  Client agrees that LTP may use Client's name and logo to identify Client as a customer of LTP on LTP's Web Site, and as a part of a general list of LTP customers for use and reference in LTP corporate, promotional and marketing literature.  Additionally, Client agrees that LTP may issue a press release identifying Client as a LTP customer.  The content of any press release identifying Client as a customer of LTP will be subject to Client's prior approval which shall not be unreasonably withheld. Similarly, Client may issue a press release identifying LTP as a provider of Services subject to LTP's prior approval.

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: ___

6.2    **Web sites.** The parties shall discuss in good faith appropriate statements and links in and to each party's Web Sites.

6.3    **Non-Exclusivity.**   Nothing in this Agreement will prevent LTP from entering into joint or cooperative marketing arrangements with, or offering similar marketing assistance to, any other third parties at any time.

7.    **CONFIDENTIALITY**

7.1    **Confidential Information**.  Each party (the "Disclosing Party") may from time to time during the term of this Agreement disclose to the other party (the "Receiving Party") certain information regarding the Disclosing Party's business, including technical, marketing, financial, employee, planning, and other confidential or proprietary information ("Confidential Information").  The Disclosing Party will mark all Confidential Information in tangible form as "confidential" or "proprietary" or with a similar legend.  The Disclosing Party will identify all Confidential Information disclosed orally as confidential at the time of disclosure.  Regardless of whether so marked or identified, however, any information that the Receiving Party knew or should have known, under the circumstances, was considered confidential or proprietary by the Disclosing Party, will be considered Confidential Information of the Disclosing Party.

7.2    **Protection of Confidential Information**.  The Receiving Party will not use any Confidential Information of the Disclosing Party for any purpose not expressly permitted by this Agreement, and will disclose the Confidential Information of the Disclosing Party only to the employees or contractors of the Receiving Party who have a need to know such Confidential Information for purposes of this Agreement and who are under a duty of confidentiality no less restrictive than the Receiving Party's duty hereunder.    The Receiving Party will protect the Disclosing Party's Confidential Information from unauthorized use, access, or disclosure in the same manner as the Receiving Party protects its own confidential or proprietary information of a similar nature and with no less than reasonable care.

7.3    **Exceptions**.  The Receiving Party's obligations under this Section 7 with respect to any Confidential Information of the Disclosing Party will terminate if such information: (a) was already lawfully known to the Receiving Party at the time of disclosure by the Disclosing Party; (b) is disclosed to the Receiving Party by a third party who had the right to make such disclosure without any confidentiality restrictions; (c) is, or through no fault of the Receiving Party has become, generally available to the public; or (d) is independently developed by the Receiving Party without access to, or use of, the Disclosing Party's Confidential Information.  In addition, the Receiving Party will be allowed to disclose Confidential Information of the Disclosing Party to the extent that such disclosure is (i) approved in writing by the Disclosing Party, (ii) necessary for the Receiving Party to enforce its rights under this Agreement in connection with a legal proceeding; or (iii) required by law or by the order or a court of similar judicial or administrative body, provided that the Receiving Party notifies the Disclosing Party of such required disclosure promptly and in writing and cooperates with the Disclosing Party, at the Disclosing Party's  request and expense, in any lawful action to contest or limit the scope of such required disclosure.

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: 

**7.4    Return of Confidential Information**.  The Receiving Party will return to the Disclosing Party or destroy all Confidential Information of the Disclosing Party in the Receiving Party's possession or control and permanently erase all electronic copies of such Confidential Information promptly upon the written request of the Disclosing Party or the expiration or termination of this Agreement, whichever comes first.   At the Disclosing Party's request, the Receiving Party will certify in writing signed by an officer of the Receiving Party that it has fully complied with its obligations under this Section 7.4.

**7.5    Confidentiality of Agreement.**  Neither party will disclose any terms of this Agreement to anyone other than its attorneys, accountants, and other professional advisors under a duty of confidentiality except (a) as required by law or (b) pursuant to a mutually agreeable press release or (c) in connection with a proposed merger, financing, or sale of such party's business (provided that any third party to whom the terms of this Agreement are to be disclosed signs a confidentiality agreement with terms no less restrictive than the confidentiality terms herein).

**7.6    LTP Exclusivity.** Client acknowledges and agrees that LTP will incur significant costs in initializing the relationship with Client, including initial setup fees and custom work charges.  In addition, LTP is providing a discount exceeding sixty percent (60%) of its standard fees.    As a consideration for LTP agreeing to waive its setup fees and custom work charges, and providing such discount, Client agrees that for the term of this Agreement LTP shall be Client's sole and exclusive provider for all distance education Content Management Systems or Learning Management Systems.

## 8.    REPRESENTATIONS AND WARRANTIES

### 8.1    Client Representations and Warranties.

Client represents and warrants to LTP that Client will use diligent efforts to ensure that its network and systems do not compromise the security or functionality of the systems used to provide the Services, whether by transfer of viruses or other harmful code, requests for service, or otherwise.  Client agrees that, in the event its network and systems compromise the security or functionality of the systems used to provide the Services, Client shall use its best efforts to assist LTP to mitigate and restore any losses that may be incurred.

### 8.2    LTP Representations and Warranties

LTP represents and warrants to Client that the Software and the Services provided to Client by LTP will not violate, plagiarize, or infringe upon the rights of any third party, including copyrights, trade secrets, privacy, or other personal or proprietary rights.  LTP further represents and warrants to Client that LTP will use diligent efforts to ensure that its network and systems used to provide the Services do not compromise the security or functionality of Client's network and systems, whether by transfer of viruses or other harmful code, or otherwise.  LTP agrees that, in the event its network and systems used to provide the Services compromise the security or functionality of

5

Universe1220
Client Initials: ____

Client's network and systems, LTP shall use its best efforts to assist Client to mitigate and restore any losses that may be incurred.

### DISCLAIMER

EXCEPT FOR THE EXPRESS WARRANTIES IN THIS SECTION 8, LTP DISCLAIMS ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, REGARDING THE SERVICES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. CLIENT ACKNOWLEDGES THAT IT HAS RELIED ON NO WARRANTIES OTHER THAN THE EXPRESS WARRANTIES IN THIS AGREEMENT.

### 9.    INDEMNIFICATION

LTP will defend at its own expense any action against Client brought by a third party to the extent that the action is based upon a claim that the Software infringes any U.S. copyrights or misappropriates any trade secrets recognized as such under the Uniform Trade Secret law, and LTP will pay those costs and damages finally awarded against Client in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action. The foregoing obligations are conditioned on Client notifying LTP promptly in writing of such action, Client giving LTP sole control of the defense thereof and any related settlement negotiations, and Client cooperating and, at LTP's request and expense, assisting in such defense. If the Software becomes, or in LTP's opinion is likely to become, the subject of an infringement claim, LTP may, at its option and expense, either (a) procure for Client the right to continue using the Software, (b) replace or modify the Software so that it becomes non-infringing, or (c) accept return of the Software and give Client a refund for the Fees paid by Client less a reasonable allowance for the period of time Client has used the Software. Notwithstanding the foregoing, LTP will have no obligation under this Section 9 or otherwise with respect to any infringement claim based upon (i) any use of the Software not in accordance with this Agreement or for purposes not intended by LTP, (ii) any use of the Software in combination with other products, equipment, software, or data not supplied by LTP, (iii) any use of any release of the Software other than the most current release made available to Client, or (iv) any modification of the Software by any person other than LTP. **EXCEPT AS PROVIDED IN SECTION 10 AND SECTION 11,** THIS SECTION 9 STATES LTP'S ENTIRE LIABILITY AND CLIENT'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT CLAIMS AND ACTIONS.

### 10.    LIMITATION OF LIABILITY

IN NO EVENT WILL LTP BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR INCIDENTAL DAMAGES, INCLUDING ANY LOST DATA AND LOST PROFITS, ARISING FROM OR RELATING TO THIS AGREEMENT. **EXCEPT AS PROVIDED IN SECTION 9 AND SECTION 11,** LTP'S TOTAL CUMULATIVE LIABILITY IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT OR TORT OR OTHERWISE, WILL NOT EXCEED THE AMOUNT OF FEES PAID TO LTP DURING THE 12-MONTH PERIOD PRECEDING THE DATE SUCH CLAIM IS MADE. CLIENT ACKNOWLEDGES THAT THE FEES REFLECT THE ALLOCATION OF RISK SET FORTH IN THIS AGREEMENT AND THAT LTP WOULD NOT ENTER INTO THIS AGREEMENT WITHOUT THESE LIMITATIONS ON ITS LIABILITY.

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: 

## 11.   RELIEF

### 11.1   Injunctive Relief.

Each party acknowledges that a breach of this Agreement, including any breach of Section 7, would result in irreparable harm to the non-breaching party. Accordingly the parties agree that in the event of a breach of this Agreement, the non-breaching party shall be entitled to apply to a court of appropriate jurisdiction for injunctive relief to prevent or stop harm to the non-breaching party, including harm relating to any Intellectual Property Rights of the non-breaching party.

### 11.2   Recovery of Litigation Costs.

In the event of any action brought to enforce this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding from the other party in addition to any other relief to which it may be entitled.

## 12.   TERM; TERMINATION

### 12.1   Initial Term.

This Agreement shall be effective from the Effective Date and thereafter remain in effect for Three years (the "Term"), unless earlier terminated in accordance with the terms of this Agreement.

### 12.2   Automatic Renewal.

Agreement will automatically renew for like term unless either party notifies the other with their desire not to renew sixty (60) days in advance of termination date.

### 12.3   Termination without Cause.

This Agreement may be terminated by either party on the last day of the Term by providing written notice to the other party not less than sixty (60) days prior to the expiration of the Term.

### 12.4   Termination for Cause.

In addition to any other rights LTP may have under this Agreement or applicable law, LTP may, at LTP's option, immediately terminate this Agreement, upon (i) a material breach by Client of Client's obligations under this Agreement which breach is not cured within thirty (30) days after written notice thereof is received by Client; (ii) Client ceasing to do business in the normal course, becoming or being declared insolvent or bankrupt, being the subject of any proceeding relating to liquidation or insolvency which is not dismissed within ninety (90) days or making an assignment for the benefit of its creditors; or (iii) Client building or attempting to build any learning platform or productivity center based on the Software or intellectual property of LTP.

Universe1220
Client Initials: 

This Agreement can be terminated by Client immediately, if (i) the Software or Services are not available to Client's users at least 90% of the time for any two of any three consecutive weeks or (ii) upon failure of LTP to address problems within 24 hours of Client reporting said issues.

### 12.5    Post Termination Obligations

In addition to any other rights Client may have under this Agreement or applicable law, if LTP ceases to do business in the normal course, becoming or being declared insolvent or bankrupt, being the subject of any proceeding relating to liquidation or insolvency which is not dismissed within ninety (90) days or making an assignment for the benefit of its creditors, Client is entitled to the platform (Izio) source code, which will be preserved in escrow for the duration of this Agreement.

### 12.6    Deactivation; Withholding of Fees

LTP reserves the right to temporarily deactivate Client's hosted software application for non-payment in accordance with the "Services Fees," outlined in Section 5.1, until payment is received.

### 12.7    Survival.

Sections 4 (Proprietary Rights), 5 (Fees, Taxes, and Expenses), 7 (Confidentiality), 8 (Representations and Warranties), 9 (Indemnification), 10 (Limitation of Liability), 11 (Relief), 12 (Term; Termination), and 13 (Miscellaneous) shall survive any expiration or termination of this Agreement.

## 13.    MISCELLANEOUS

### 13.1    Entire Agreement.

This Agreement and the Exhibits attached hereto constitute the entire agreement between LTP and Client with respect to the subject matter hereof and supersedes all prior oral negotiations and prior written agreements with respect thereto.

### 13.2    Independent Contractors

Nothing in this Agreement or in the course of dealing between Client and LTP pursuant hereto shall be deemed to create between Client and LTP (including their respective directors, officers, employees and agents) a partnership, joint venture, association, employment relationship or any other relationship, other than that of independent contractors with respect to each other. LTP shall not have the authority to commit or legally bind Client in any manner whatsoever, including the acceptance or making of any agreement, representation or warranty.

### 13.3    Waiver; Non-Waiver; Amendment.

Failure by either party to enforce any of the provisions of this Agreement or any rights with respect hereto or the failure to exercise any option provided

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: 

hereunder shall in no way be considered to be a waiver of such provision, right or option, or to in any way affect the validity of this Agreement. No waiver of any rights under this Agreement, or any modification or amendment of this Agreement shall be effective or enforceable, unless in writing and signed by both parties.

### 13.4  Governing Law and Venue.

This Agreement is governed by the laws of the State of California as such laws apply to contracts between California residents performed entirely within California. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement. Any action or proceeding arising from or relating to this Agreement may be brought in a federal court in the Northern District of California or in state court in San Francisco County, California, and each party irrevocably submits to the jurisdiction and venue of any such court in any such action or proceeding.

### 13.5  Assignment.

Client may not assign or transfer, by operation of law or otherwise, any of its rights under this Agreement (including its licenses with respect to the Licensed Software) to any third party without LTP's prior written consent, except pursuant to a transfer of all or substantially all of Client's business and assets, whether by merger, sale of assets, sale of stock or otherwise. Any attempted assignment or transfer in violation of the foregoing will be void.

### 13.6  Notice.

All notices or other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile or electronic mail (with written confirmation of receipt), or (c) two (2) days after being deposited for delivery with a nationally recognized overnight delivery service, such as Federal Express, and addressed or sent, as the case may be, to the appropriate addresses or facsimile numbers set forth below (or to such other addresses or facsimile numbers as a party may designate by notice to the other party):

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: ___

In the case of Client:

>   University of the Incarnate Word
>   Dr. Cyndi Porter, Dean Universe Online
>   4300 Broadway,
>   San Antonio, TX 78209

In the case of LTP:

>   Mr. Reda Athanasios
>   595 Market Street, Suite 1340
>   San Francisco, CA 94105
>   Tel: (415) 495-8555
>   Facsimile No.: (415) 495-8570

### 13.7    Severability.

If any provision of this Agreement is held invalid or unenforceable, such provision shall thereupon be deemed modified only to the extent necessary to render the same valid or eliminated from this Agreement, as the situation may require, and this Agreement shall be enforced and construed as if such provision had been included herein as so modified in scope or applicability or not been included herein, as the case may be.

### 13.8    Responsibility for Account Number/Passwords.

Client is responsible for all uses of Software whether or not authorized by Client. Client is responsible for maintaining the confidentiality of Client's account numbers and passwords. Client agrees to immediately notify LTP of any unauthorized use of Client's account of which Client becomes aware.

### 13.9    Responsibility for Content of Communication.

Client agrees that Client is solely responsible for the content of all visual, written or audible communications using Client's account. Client agrees that Client will not use Services to send unsolicited mass mailings outside Client's company or organization. Client further agrees not to use Services to communicate any message or material that is harassing, libelous, threatening, and obscene, would violate the intellectual property rights of any party or is otherwise unlawful, that would give rise to civil liability, or that constitutes or encourages conduct that could constitute a criminal offense, under any applicable law or regulation. Although LTP is not responsible for any such communications, LTP may delete any such communications of which LTP becomes aware, at any time without notice.

### 13.10    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute but one agreement.

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: 

### 13.11  Construction.

The headings preceding the text of the paragraphs of this Agreement have been inserted solely for convenience of reference and neither constitutes a part of this Agreement nor affects its meaning, interpretation or effect.   Where used in this Agreement, the word "including" means "including but not limited to".

### 13.12  Force Majeure.

If performance hereunder is interfered with by any condition beyond a party's reasonable control, the affected party shall be excused from performance to the extent of such condition.  The operation of LTP's servers and the provision of the Services may be interfered with by numerous factors outside of LTP's control.   LTP does not guarantee continuous, uninterrupted or secure Services, and Client acknowledges that the Services may be unavailable for sustained periods of time.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**LTP, LLC.**                                            **(CLIENT)**

By: _____          By: _____

Reda Athanasios,                                 _____
(Print Name):                                         Douglas B Endsley
                                                              (Print Name):

Title:  President                                   Title:  V-P. for Business & Finance

Date: _____     Date:  December 22, 2004

LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: 

## EXHIBIT A

## SERVICES AND FEES

I.    **SERVICES**

Services as described herein may only be amended or expanded with an amendment to the Agreement in writing and signed by both parties.

- **A license** for the LTP Learning Platform (IZIO).  This software license includes unlimited access rights to the LTP Learning Platform for the 36-month period beginning with the Effective Date.  It also includes access to updated versions of the LTP Learning Platform, increased functionality of the core application and added features and enhancements as they become available during the license period.
- **Hosting of all offerings** developed by Client on the LTP Learning Platform.  LTP will provide technical support, hosted servers, network administration, software and system maintenance, mirror servers and backup services.

                                    LTP, LLC. CONFIDENTIAL

Universe1220
Client Initials: ____

## II.    FEES

User Fees (IZIO "named users") will be determined according to the total user account population on the IZIO for the 30 days prior to the date of billing, usually the 15th of every month, beginning on the first month of the contract.  "Named Users" are anyone enrolled on the IZIO including (but not limited to): administrators, instructors, staff, and enrolled students.  Client is responsible for maintaining the accuracy of the user accounts.

All discounts shall be in accordance with Table 1 and are valid until March 5, 2005. If client fails to sign this contract by the aforementioned date, the fees are subject to change.

| USERS CHARGES |
| :---: |
| UIW UNIVERSE WILL PAY LTP **$15 PER A STUDENT PER (5- 8 WEEKS) SEMESTER PER COURSE FOR UP TO 1800 STUDENTS IN ANY GIVEN SEMESTER** |
| UIW UNIVERSE WILL PAY LTP **$12 PER A STUDENT PER (5- 8 WEEKS) SEMESTER PER COURSE FOR ALL STUDENTS ABOVE 1800 AND UP TO 2500 IN ANY GIVEN SEMESTER** |
| UIW UNIVERSE WILL PAY LTP **$11 PER A STUDENT PER (5- 8 WEEKS) SEMESTER PER COURSE FOR ALL STUDENTS ABOVE 2500 IN ANY GIVEN SEMESTER** |
|  |

III.    OPTIONAL GRAPHIC WORK CLIENT WILL PAY LTP A **$100/HOUR** FOR ANY WORK DONE SUBJECT TO CLIENT PRE-APPROVAL.

IV.    PAYMENT SCHEDULE PAYMENT WILL BE DUE IN FULL UPON THE FIRST DAY OF THE MONTH FOLLOWING SEMESTER START DATE.

LTP, LLC. CONFIDENTIAL

# EXHIBIT 2

## Addendum to Contract Agreement

In reference to the Services agreement by and between the undersigned, said agreement being dated December 22nd, 2004 (Contract).

BE IT KNOWN that for good consideration the parties made the following changes a part of said contract as if contained therein.

AMENDMENT TO AGREEMENT Term
ARTICLE 12 clauses 12.1 Initial Term;
The Agreement ending date will be extended to December 31, 2014

AMENDMENT TO Exhibit A SERVES and FEES

Exhibit A Services and Fees, the fee per student per course in the USERS CHARGES schedule; will change to $24 for all online VU students.

Exhibit A Services and Fees, the fee per student per course in the USERS CHARGES schedule; will change to $14 for all ADCaP Blended Learning students.

Exhibit A Services and Fees, the fee per student per course in the USERS CHARGES schedule; will change to $4 for all ADCaP students other than Blended Learning.

All other services and charges remain the same as agreed upon by both parties.

Except as provided herein, all other terms and conditions set forth of said Contract Agreement shall remain in full force and effect.


**Reda Athanasios**

For: **Learning Technology Partners**

Date: 12 - 16 - 2013


**Douglas Endsley**

For: **University of the Incarnate Word**

Date: 12/10/2013

# EXHIBIT 3



# UNIVERSITY OF THE
# INCARNATE WORD

October 18, 2013

Mr. Reda Athanasios
Learning Technology Partners
1840 San Miguel Dr. Ste. 101
San Francisco, CA 94596-8603

Dear Mr. Athanasios:

The University of the Incarnate Word appreciates the nearly 9 years of service from LTP. It has become apparent to the University that the services provided by LTP should be replaced by other products that are paid for and currently in service in the greater part of the University.

The University is giving notice that it will terminate the current agreement signed December 22, 2004 and twice extended through December 22, 2013. The notice is provided at this time, in accordance with Section 12.3 of the agreement, which requires 60 days' notice.

Dr. Cyndi Porter, V.P. for Extended Academic Programs assures me that you are in agreement to develop a one-year agreement, at the same terms, for the January 2014 – January 2015 time period.

Should you require further information please feel free to contact me or Dr. Porter, at (210) 829-2706 or porter@uiwtx.edu. I may be reached at (210) 829-6004 or douge@uiwtx.edu. Thank you again for your service to the University.

Sincerely,

Douglas B. Endsley
V. P. for Business & Finance

cc: Dr. Cyndi Porter, V. P. for Extended Academic Programs