1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LEARNING TECHNOLOGY
PARTNERS,

               Plaintiff,

     v.

UNIVERSITY OF THE INCARNATE
WORD,

               Defendant.

Case No. 14-cv-4322-PJH

**ORDER DENYING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

On October 14, 2015, defendant's motion for partial summary judgment came on for hearing before this court. Plaintiff Learning Technology Partners ("plaintiff" or "LTP") appeared through its counsel, Michael Dorsi. Defendant University of the Incarnate Word ("defendant" or "UIW") appeared through its counsel, Jon Eldredge and Clement Glynn. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

This is a breach of contract case. Plaintiff LTP is an online education software company. Its president is Reda Athanasios. Defendant UIW is a private university located in San Antonio, Texas. Vince Porter serves as UIW's dean, and Dr. Cyndi Porter serves as its Vice President.

UIW offers on-campus courses as well as a number of online courses and partially-online courses. The parties use UIW's own terminology to refer to these various

1   courses, and the court will use that terminology throughout this order.

2          UIW's all-online college courses are referred to as either "UIW Online" or

3   "Universe Online."

4          UIW also has an adult education program called the Adult Degree Completion

5   Program, or "ADCaP."  ADCaP is split into two categories.  One is for students who take

6   classes primarily on-campus, and they are referred to as "ADCaP Non-Blended" (also

7   referred to in the parties' papers as "click through" students).  The second category is for

8   students who take classes primarily online, with a small on-campus component.  Those

9   students are referred to as "ADCaP Blended."

10         Finally, UIW offers an online high school program referred to as "UIW Prep."

11         In 2004, the parties entered into a contract (referred to as the "Services

12  Agreement") under which LTP would provide to UIW an "online learning platform" called

13  "IZIO."  LTP describes IZIO as a platform to "manage all teaching and learning aspects of

14  the institution's relationship with its students, from posting of course materials and

15  announcements to grading of exams."

16         The original term of the Services Agreement was three years, but it was extended

17  multiple times, the final extension coming in December 2013.  That extension (referred to

18  as an "addendum") was for a term of one year, to end on December 31, 2014.

19         At the time that the original Services Agreement was executed, LTP provided

20  services only for UIW Online (i.e., the online college courses), but over time, LTP also

21  began providing services for the ADCaP programs and the UIW Prep program.

22         Under the terms of the agreement, UIW paid LTP a per-student fee for each

23  student who used the LTP software as part of their courses.

24         LTP now claims that UIW breached five provisions of the contract, three of which

25  are at issue on this motion.  The facts regarding each alleged breach are disputed, so the

26  court will first present each relevant provision, and then will summarize the facts as

27  alleged by each party.

28

United States District Court
Northern District of California

Section 7.6 (exclusivity provision)

Section 7.6 of the Services Agreement provides as follows:

> **LTP Exclusivity**.  Client acknowledges and agrees that LTP will incur significant costs in initializing the relationship with Client, including initial setup fees and custom work charges.  In addition, LTP is providing a discount exceeding sixty percent (60%) of its standard fees.  As a consideration for LTP agreeing to waive its setup fees and custom work charges, and providing such discount, Client agrees that for the term of this Agreement LTP shall be Client's sole and exclusive provider for all distance education Content Management Systems or Learning Management Systems.

LTP alleges that UIW breached the exclusivity provision in three ways.  First, it alleges that UIW Prep students used another software program, thereby violating the provision.  UIW does not dispute that UIW Prep students did indeed use a different software program, but it maintains that UIW Prep is not covered by the exclusivity provision.

Interestingly, UIW Prep did not yet exist at the time of the contract's original execution in 2004 (it was started in 2010).  There was correspondence between the parties before the contract was finalized in 2004, and both parties point to the correspondence as supporting their position – with LTP arguing that it shows that UIW Prep should be covered by the exclusivity provision, and UIW arguing that it shows the opposite.

The substance of the correspondence is as follows.  Before the agreement was executed, UIW's lawyer reviewed the exclusivity provision, and had concerns that it would interfere with UIW's non-online students, who used a different software provider (called "Blackboard") to access course materials.  To clarify, Dr. Cyndi Porter sent an email to Athanasios, stating that UIW's lawyer was "concerned that we use Blackboard on our main campus program," but noting that she "assured him that this contract is between LTP and UIW Universe Online and that what they do on main campus has no part of this contract."  Dkt. 53, Ex. C.  Dr. Porter asked Athanasios to "add a sentence to your fax stating that Universe Online is the only part of UIW that is tied to exclusive use of

United States District Court
Northern District of California

your products?" Id. Athanasios responded with a fax stating "We also understand that, said [exclusivity] provision, only pertains to UIW Distance Education online program." Dkt. 53, Ex. D.

Based on this correspondence, UIW argues that only the UIW Online program (i.e., not UIW Prep) is subject to the exclusivity provision.

LTP argues that the Services Agreement was amended over time – first to include ADCaP non-blended, then to include UIW Prep, then to include ADCaP blended – and that the exclusivity provision was intended to cover all of them. LTP does not point to any formal amendments – instead, it appears that the parties had an informal practice of discussing potential expansions over email, after which they would negotiate price and then have LTP implement the functionality.

LTP also makes an alternative argument – that in response to Dr. Porter's request for clarification, Athanasios "rejected [her] narrow interpretation, insisting that the exclusivity clause apply more broadly to all of UIW's courses that took place solely online and did not have a classroom component." Dkt. 52 at 6. LTP claims that, by "differentiating between 'UIW Distance Education online program' and 'UIW Online Universe,' the parties intended for the exclusivity agreement to apply to courses and products outside of UIW Online." Id. LTP also characterizes Athanasios' use of the "distance education" terminology as "counter offering a more broad interpretation." And because "UIW did not reject this counter offer" and continued to move forward with the agreement, UIW accepted the counteroffer.

The second alleged breach of the exclusivity provision is slightly more straightforward. In 2013, UIW made the decision to stop using LTP's software and to transition to Blackboard's software. As part of the transition, UIW planned to conduct "test" courses using Blackboard in summer 2014, before its agreement with LTP lapsed in December 2014. Before implementing the test courses, it notified LTP that it was planning to do so, and then "voluntarily paid LTP the full price for the 111 enrollments it would have paid had the students been enrolled in IZIO instead of Blackboard." LTP

4

accepted the payment, which, according to UIW, meant that LTP acquiesced to the use of Blackboard and thus cannot now claim a breach of contract. UIW further argues that, even if the Blackboard test courses technically constituted a breach, there are no damages, since LTP was fully compensated.

LTP disputes that it acquiesced to the breach of exclusivity. When UIW first emailed Athanasios about the test courses, Athanasios responded by saying "you also still have the exclusivity provision so we will have to work something around that if we need to and if we can." Dkt. 53, Ex. H. With regard to the check, LTP claims that there was no understanding that the check was meant as compensation for the breach of exclusivity. LTP cites to the letter accompanying the check, which makes no mention of waiving the exclusivity provision. Dkt. 53, Ex. I. The letter and check are also relevant to the third alleged breach of exclusivity, so it will be discussed further in the next paragraphs.

The third alleged exclusivity breach began in August 2014 and continued through the end of the contract term in December 2014. In August, UIW informed LTP that it intended to terminate the agreement early. UIW sent a letter to LTP giving notice of termination, and also enclosing a check for $120,144 to cover the remaining term of the agreement (the check also included the payments for the 111 students from the "test" courses, mentioned above[1]). UIW estimated the number of enrollments that it would receive from August 2014 until the end of the contract term in December 2014, calculated how much it would owe LTP based on those enrollments, and paid that amount, along with the above-mentioned payment for the 111 "test" students.

The letter accompanying the check stated that "[i]n order to fulfill payment terms of the contract addendum of December 10, 2013, I am enclosing a check for $120,144.00."

---

[1] The parties' papers never make clear that the 111 "test" student payments and the estimated fall 2014 student payments were paid in one lump sum via the August 2014 check, but an email from Dr. Porter to Athanasios breaks down the total amount paid, and it shows that the check included payment for the 111 "test" students. See Dkt. 46, Ex. G.

1    Dkt. 53, Ex. I.  "Your acceptance of this check will signify your willingness to give me

2    access to our current Izio portal to retrieve historical information for a period of six

3    months."  Id.

4        UIW argues that, by accepting the check, LTP acquiesced to UIW's use of

5    Blackboard, both for the "test" courses and for the post-August 2014 use.  Thus, UIW

6    argues that there was no breach of the exclusivity provision.  UIW further argues that,

7    even if there was a breach, there are no damages, because LTP was fully compensated

8    for any amount that it would have earned under the contract.

9        In LTP's view, its acceptance of the check did not signify acquiescence to the

10   breach of exclusivity.  LTP points to the language used in the letter, which mentions

11   nothing about exclusivity, and indicates that the payment was provided to ensure that

12   UIW would continue to have access to IZIO.  LTP also cites an email sent by Athanasios

13   in response to the letter, in which he says "You have requested in your letter that we

14   keep access to the systems for 6 months and we have no problem with that as we fully

15   intend to do it for remainder of our contract anyways.  Please be aware that cashing the

16   check will not constitute waiving any of our rights under the contract or accepting the

17   count of enrollments you estimated by any means."  Dkt. 53, Ex. J.  Thus, according to

18   LTP, it preserved its right to seek damages for the breach of exclusivity.

19       As to the amount of those damages, LTP points back to the exclusivity provision of

20   the contract, which states that "[a]s a consideration for LTP agreeing to waive its setup

21   fees and custom work charges, and providing such [60%] discount, Client agrees that for

22   the term of this Agreement LTP shall be Client's sole and exclusive provider."  See

23   Complaint, Ex. 1.  Because UIW breached the exclusivity provision, LTP argues, it is now

24   entitled to the full (non-discounted) rate for all students and a reimbursement of its

25   previously-waived startup costs.  As a result, LTP maintains that the payment provided by

26   UIW was not sufficient to fully compensate it for UIW's use of Blackboard – either for the

27   "test" courses or the post-termination use.

28

United States District Court
Northern District of California

Fee schedule (section 5.1 and exhibit A)

LTP also alleges that UIW breached the fee schedule set forth in section 5.1 and exhibit A of the agreement (and as later amended).  Section 5.1 reads as follows:

> Client shall pay LTP all fees for the Core Services in accordance with the applicable fee schedule set forth in Exhibit A.

Exhibit A, in turn, reads:

> UIW Universe will pay LTP $15 per a student per (5-8 weeks) semester per course for up to 1800 students in any given semester.

> UIW Universe will pay LTP $12 per a student per (5-8 weeks) semester per course for all students above 1800 and up to 2500 in any given semester.

> UIW Universe will pay LTP $11 per a student per (5-8 weeks) semester per course for all students above 2500 in any given semester.

LTP alleges that UIW violated these provisions of the agreement in two ways:  (1) by enrolling ADCaP non-blended students in IZIO, without paying the per-student rate, and (2) allowing ADCaP students to use IZIO for greater than the eight-week period set forth in the agreement.

The facts underlying (1) are very much disputed.  The ADCaP non-blended students were not covered under the original 2004 agreement, but in 2009, UIW approached LTP to ask if there was a way to allow the non-blended students to access their textbooks online, through IZIO.  LTP responded that there were technical obstacles preventing that functionality, but suggested that the non-blended students use a "web portal" (which is described as a web page used by the students that allowed them to view school-related information, but without the full range of use that IZIO provided).  UIW agreed, and the parties negotiated a $2 per student rate for this textbook access through the web portal.  It appears that this deal was worked out over email, and not memorialized in a written contract.

For the next year and a half, the ADCaP non-blended students used the web portal to access their textbooks.  However, in 2011, UIW switched to a new textbook

7

United States District Court
Northern District of California

1  vendor (called CourseSmart).  On December 8, 2011, Dr. Cyndi Porter emailed

2  Athanasios asking if they could have a phone call to "talk about what you are going to do

3  with ADCaP."  Dkt. 53, Ex. P.  According to the email, Vince Porter believed that UIW

4  "was going to use the portal for the integration not Izio."  Id.  Athanasios responded that

5  he was "scrambling to see if we can achieve what Vince likes before this coming quarter,"

6  but also said that "[w]hat we have developed in Izio will work for Vince today."  Id.

7  Athanasios also stated that he "suggested to Vince using the Portal only for the non-

8  blended guys who have no need for Izio otherwise."  Id.  Vince Porter wrote back to say

9  that "using Izio is fine with me," to which Athanasios replied "this is a kind consideration

10  and a good spirit of cooperation Vince."  Id.  Athanasios also said that he would "continue

11  to work towards giving your non-blended students an ability to get their books through the

12  portal," and that he would "come out with a plan tomorrow."  Id.

13       The parties draw different conclusions from this exchange.  UIW contends that

14  Athanasios gave the non-blended students permission to use IZIO, because their

15  previous method of using the web portal no longer functioned with the new CourseSmart

16  books.  LTP argues that only the blended students were given permission to use IZIO,

17  and that the non-blended students were to continue using the web portal.

18       After the December 2011 exchange, UIW's non-blended students began using

19  IZIO to access their textbooks.  Regarding the "plan" that Athanasios was going to submit

20  to UIW, it never came to be – LTP claims that it was completed, but never implemented,

21  because "Vince Porter never responded to LTP's meeting request," while UIW claims that

22  the new module was not completed until November 2012 or January 2013, and also

23  argues that LTP's web developer was told to stop working on it after the parties'

24  agreement to have the non-blended students use IZIO.

25       LTP now claims that the non-blended students were never given permission to use

26  IZIO, and that UIW has not fully compensated LTP for such use, as UIW never paid the

27  full fee for those students, only the $2 per student that it was originally paying for portal-

28  based textbook access.

United States District Court
Northern District of California

1    UIW not only argues that it was given permission via the December 2011 email

2    exchange, but also argues that LTP's account manager (Luigi DiGrande) helped set up

3    IZIO accounts for the non-blended students, further showing LTP's acquiescence.  LTP

4    now claims that DiGrande did not have any authority to modify the contract, as he was an

5    independent contractor with no knowledge of the contract's terms.[2]

6    Moving to category (2) of the alleged violation of section 5.1, LTP alleges that UIW

7    violated the agreement by allowing their ADCaP students to access IZIO immediately

8    after registration, resulting in more than eight weeks of access.  LTP argues that the

9    Services Agreement allowed IZIO access only for a maximum of eight weeks per course.

10   UIW argues that the parties never agreed to an eight week limitation.  UIW also argues

11   that DiGrande helped UIW set up courses for longer than eight weeks.

12   Section 4.3 (restrictions on use of LTP's technology)

13   Section 4.3 reads as follows:

14
15       Client acknowledges that the Software and its structure, organization, and
         source code constitute valuable trade secrets of LTP.  Accordingly, Client
16       agrees not to (a) modify, adapt, alter, translate, or create derivative works
         from the Software; (b) merge the Software with other software; (c)
17       sublicense, lease, rent, loan, or otherwise transfer (except as explicitly
         provided in Section 3) the Software to any third party; (d) reverse engineer,
18       decompile, disassemble, or otherwise attempt to derive the source code for
         the Software; or (e) otherwise use or copy the Software except as expressly
19       allowed under Section 3.

20   LTP alleges that UIW has "breached section 4.3 of the service agreement by

21   allowing UIW to integrate IZIO with other products, thus allowing competitors the ability to

22   copy or create derivative works of LTP's technology," and further alleges that UIW

23   "adapted and customized third party software, including Black Board, Banner, Recruiter,

24   and DataTel to replicate the turn-key product that LTP provides."  LTP argues that UIW

25   "created software 'bridges' in order to replicate the whole system solution that belongs to

26

27   [2] Despite all of this, UIW does admit that certain professors of non-blended students did
     "mistakenly overuse" IZIO, utilizing services that UIW was not entitled to under the
28   contract.  UIW refers to these as "rogue courses," and explains that it is not seeking to
     adjudicate any claims arising out of the rogue courses on this motion.

9

1    LTP."  UIW does not dispute that it created software bridges, but maintains that such

2    bridges are not derivative works.

3           LTP filed suit in state court on August 19, 2014, asserting one cause of action for

4    breach of contract.  The case was removed to this court on September 25, 2014.  In

5    addition to alleging the above breaches (of sections 7.6, 5.1, and 4.3), the complaint also

6    alleges breaches of sections 8.1 and 13.8, which restrict the use of LTP's software.

7    However, UIW does not move for summary judgment as to those alleged breaches, so

8    they are not discussed in this order.  UIW moves for partial summary judgment only as to

9    the alleged breaches of section 7.6, 5.1, and 4.3 of the Services Agreement.[3]

**DISCUSSION**

10

11   A.     Legal Standard

12          A party may move for summary judgment on a "claim or defense" or "part of . . . a

13   claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there

14   is no genuine dispute as to any material fact and the moving party is entitled to judgment

15   as a matter of law.  Id.

16          A party seeking summary judgment bears the initial burden of informing the court

17   of the basis for its motion, and of identifying those portions of the pleadings and discovery

18   responses that demonstrate the absence of a genuine issue of material fact.  Celotex

19   Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the

20   outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

21   dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

22   jury to return a verdict for the nonmoving party.  Id.

23          Where the moving party will have the burden of proof at trial, it must affirmatively

24   ─────────────────────

25   [3] UIW's motion also purports to seek summary judgment as to LTP's allegation, made in
     an interrogatory response, that UIW improperly disclosed LTP's source code and other
26   confidential information. Dkt. 44 at 23.  LTP does not make this allegation in its
     complaint, nor is the allegation addressed in LTP's opposition brief.  Given that the only
27   place in which this allegation appears is in an interrogatory response (i.e., not the
     complaint), and given LTP's failure to address the issue in its opposition, the court
28   considers the allegation to have been abandoned by LTP, and does not address it further
     in this order.

United States District Court
Northern District of California

demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

If a party makes a showing "that there is no genuine issue of material fact as to particular claim(s) or defense(s), the court may grant summary judgment in the party's favor 'upon all or part thereof.'"  Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2008) § 14:33 (emphasis added).  "This procedure is commonly referred to as a 'partial summary judgment.'" Id. § 14:34.

B.    Legal Analysis

As mentioned above, UIW moves for partial summary judgment regarding the alleged breaches of three provisions of the Services Agreement.  The court will address each allegedly-breached provision in turn.

11

1       1.      Section 7.6 (exclusivity provision)

UIW raises three issues relating to its alleged breach of the exclusivity provision: (1) UIW Prep was not covered by the exclusivity provision, and thus, those students' use of non-LTP software cannot constitute a breach; (2) LTP acquiesced to UIW's use of Blackboard for its "test" courses, and thus, there is no breach, and even if there was a breach, there are no damages; and (3) UIW's early termination of the Services Agreement did not cause LTP to suffer any damages.

Starting with (1), UIW makes two independent arguments here – first arguing that no part of the Services Agreement applies to UIW Prep, and separately arguing that, even if the Services Agreement does apply, the exclusivity provision does not.

As mentioned above, the Services Agreement was executed in December 2004, and because UIW Prep did not come into existence until 2010, it obviously could not have been covered by the original agreement. Nor did the parties expressly amend the agreement to include UIW Prep. Instead, it appears that the parties informally agreed to have LTP provide its software for UIW Prep, though the parties appear to dispute the terms of their informal agreement. LTP explains that it was "tapped" by UIW to "develop the software platform necessary to operate UIW Prep and in 2010, UIW began enrolling UIW Prep students in IZIO," and further argues that "the Services Agreement was amended to include UIW Prep via email." Dkt. 52 at 3. UIW counters that "LTP cannot identify any document showing that UIW Prep was added to the Services Agreement despite specifically alleging that the amendment was by way of email." Dkt. 58 at 2. However, UIW does not offer any evidence of its own regarding LTP's provision of software for UIW Prep. In fact, UIW offers no explanation of what terms govern the UIW Prep software, and is instead content to deny LTP's allegations.

It is undisputed that LTP provided services to UIW for UIW Prep, so there must have been some type of an agreement between LTP and UIW regarding UIW Prep. See Dkt. 46, ¶ 6. LTP argues that the parties informally agreed via email to add UIW Prep to the Services Agreement, and while UIW objects to LTP's failure to submit those emails

United States District Court
Northern District of California

1    as evidence, UIW also fails to submit any evidence in support of its own argument that

2    the UIW Prep-related software was subject to terms other than those provided in the

3    Services Agreement.  Without any further evidence, the court is left with only the course

4    of conduct between the parties – with LTP providing services for UIW Prep, and UIW

5    paying for those services.  Based on that course of conduct, and based on the fact that

6    UIW presents none of its own evidence suggesting that UIW Prep was subject to some

7    agreement separate from the Services Agreement, the court finds there to be a triable

8    issue of fact as to whether UIW Prep was added to the Services Agreement.

9          UIW's next argument is that, even if UIW Prep is subject to the Services

10   Agreement, it is not subject to the exclusivity provision.  UIW relies on the email/fax

11   exchange between Dr. Porter and Athanasios before the contract was executed.  As an

12   initial matter, by basing its argument on the exchange between Dr. Porter and

13   Athanasios, UIW implicitly concedes that the language of the contract does not

14   definitively support its position.  The contract states only that "LTP shall be Client's sole

15   and exclusive provider for all distance education Content Management Systems or

16   Learning Management Systems," and does not specifically carve out any of UIW's online

17   programs from the exclusivity provision.  See Complaint, Ex. 1 at § 7.6.

18         As mentioned above, before the contract was executed, Dr. Porter and Mr.

19   Athanasios negotiated certain provisions over email, including the exclusivity provision.

20   According to UIW, Dr. Porter asked Athanasios to clarify that "UIW Universe Online" is

21   the only part covered under the exclusivity provision, and (in UIW's view), Athanasios

22   "confirmed it was so limited."  Dkt. 44 at 12.

23         However, the actual evidence tells a different story.  The exchange began when

24   Dr. Porter forwarded to Athanasios an email thread between her and UIW's attorney,

25   discussing various provisions of the Services Agreement.  Dr. Porter told Athanasios that

26   the "lawyer didn't like some of our language (What a shock, eh?) so here is his final

27   tweaking."  Dkt. 53, Ex. C.  Dr. Porter also asked Athanasios to "put in your exclusive

28   language and tell me where it is."  Id.

13

United States District Court
Northern District of California

1    After receiving a draft containing the exclusivity language, Dr. Porter emailed

2  Athanasios to say that "the man on campus is concerned that we use Blackboard on our

3  main campus program.  I assured him that this contract is between LTP and UIW

4  UNIVERSE ONLINE and that what they do on main campus has no part of this contract.

5  Can you add a sentence to your fax stating that Universe Online is the only part of UIW

6  that is tied to exclusive use of your products?"  Dkt. 53, Ex. C.

7    Athanasios then responded by sending a letter via fax, stating that he understands

8  that "said provision" (referring to the exclusivity provision) "only pertains to UIW Distance

9  Education online program."  Dkt. 53, Ex. D.

10    In its motion, UIW ignores the phrasing used by Athanasios, even though it mirrors

11  the language used in the contract, which states that "LTP shall be Client's sole and

12  exclusive provider for all distance education Content Management Systems or Learning

13  Management Systems."  Complaint, Ex. 1, § 7.6 (emphasis added).  UIW does not

14  present any argument on the meaning of the term "distance education" as used in the

15  contract, so the court has no basis on which to find that it includes or excludes UIW Prep.

16    Overall, taking into account both the contract itself and the extrinsic evidence

17  submitted by UIW, the court finds there to be a triable issue of fact as to whether UIW

18  Prep was covered by the exclusivity provision.  As mentioned above, the language of the

19  agreement itself does not resolve the issue, nor does the exchange between Athanasios

20  and Dr. Porter clear up the uncertainty.  While LTP ultimately bears the burden at trial of

21  showing that the exclusivity provision does apply to UIW Prep, the court finds that the

22  cited evidence is sufficient to create a triable issue of fact on that question.  A reasonable

23  factfinder could find that Dr. Porter was attempting to draw a line between the services

24  used for on-campus (i.e., non-online) courses, and those used for online courses.  Her

25  email specifically mentions giving assurances to her lawyer that "this contract is between

26  LTP and UIW Universe Online and that what they do on the main campus has no part of

27  this contract."  Dkt. 53, Ex. C (emphasis added).  Under that interpretation, any online

28  courses for which LTP provided software pursuant to the Services Agreement would be

1   subject to the exclusivity provision.

2       The second alleged breach of the exclusivity provision relates to the Blackboard

3   "test" courses conducted in the summer of 2014.  As mentioned above, UIW decided in

4   2013 that it would stop using LTP's software after the termination of the Services

5   Agreement, and would instead use software developed by one of LTP's competitors,

6   Blackboard.  UIW enrolled 111 students in Blackboard test courses in order to prepare for

7   the transition.  By itself, UIW's use of Blackboard does appear to constitute a breach,

8   though UIW argues that it "paid full price for the 111 enrollments it would have paid had

9   the students been enrolled in IZIO instead of Blackboard," and because "LTP accepted

10  the payment without objection or dispute," it therefore "acquiesced," negating any breach.

11  Dkt. 44 at 12-13.

12      LTP disputes that it "acquiesced" to anything, and emphasizes that, when Dr.

13  Porter emailed Athanasios to inform him of the test program, Athanasios responded "You

14  also still have the exclusivity provision so we will have to work something around that if

15  we need to and if we can," to which Porter replied "I know about the exclusivity provision.

16  I don't mean for you to lose any revenue."  Dkt. 53, Ex. H.  LTP further argues that, while

17  it did accept the payment mentioned by UIW, the letter accompanying that payment said

18  nothing about exclusivity.  In LTP's view, the payment was offered only as consideration

19  for allowing UIW to continue to access IZIO records past the end of the contract term.

20  Dkt. 53, Ex. I ("Your acceptance of this check will signify your willingness to give me

21  access to our current Izio portal to retrieve historical information for a period of six

22  months.").  Athanasios' response further bolsters his argument that there was no

23  waiver/acquiescence, as he said "please be aware that cashing the check will not

24  constitute waiving any of our rights per our contract."  Dkt. 53, Ex. J.

25      The court agrees with LTP that there was no acquiescence to the "test" course-

26  related breach.  UIW may still argue that it fully compensated LTP for any breach, thus

27  negating the damages element of LTP's claim, but that argument will be addressed

28  below.

United States District Court
Northern District of California

1    The third and final alleged breach of section 7.6 relates to the early termination of

2  the Services Agreement by UIW.  As mentioned above, in August 2014, UIW notified LTP

3  that it intended to terminate the agreement early, and provided a payment to LTP based

4  on the estimated number of enrollments from August until the end of the contract term in

5  December 2014.

6    Confusingly, UIW appears to concede that the early termination of the agreement

7  was an "efficient breach" of the agreement, while simultaneously arguing that "there was

8  no breach."  The court finds that the early termination of the agreement did indeed

9  constitute a breach, but UIW may still argue that summary judgment is warranted

10  because LTP was fully compensated, thus negating any damages.

11    The damages issue is one of the main points of contention between the parties on

12  this motion.  As mentioned above, regarding the latter two alleged exclusivity breaches,

13  UIW argues that summary judgment is warranted because LTP was fully compensated

14  for any breach, and thus, there are no damages.  LTP responds by arguing that the rates

15  set forth in the contract are its "discounted" rates, and that the discount was contingent

16  on exclusivity.  Because UIW breached exclusivity, LTP argues, it must now pay the non-

17  discounted rates.

18    LTP argues that the language used in the contract supports its position, because

19  the discount is specifically tied to exclusivity:

20    Client acknowledges and agrees that LTP will incur significant costs in
     initializing the relationship with Client, including initial setup fees and
21    custom work charges.  In addition, LTP is providing a discount exceeding
     sixty percent (60%) of its standard fees.  As a <u>consideration</u> for LTP
22    agreeing to <u>waive its setup fees</u> and custom work charges, and <u>providing
     such discount</u>, Client <u>agrees that for the term of this Agreement LTP shall
23    be Client's sole and exclusive provider</u>.

24

25  Complaint, Ex. 1 at § 7.6 (emphasis added).

26    In LTP's view, the Services Agreement provides for two exchanges:  one where

27  LTP provides software services to UIW in exchange for money, and a separate one

28  where UIW provides exclusivity to LTP in exchange for money.  Because the value of the

United States District Court
Northern District of California

1    software exceeded the value of the exclusivity, LTP's "payment" was made in the form of

2    a discount, rather than an actual tender of money to UIW.  LTP's position is that, if UIW

3    does not provide a service that LTP paid for, then UIW must refund the value of the

4    discount.

5    UIW responds by arguing that, if it were forced to pay the non-discounted rates,

6    LTP would end up in a better position than it would have been if the contract had been

7    fully performed.  In other words, if there were no alleged breach of the exclusivity

8    provision, then LTP would not be entitled to the non-discounted fees and startup costs,

9    and thus, by seeking those fees and costs now, LTP's damages claim goes beyond the

10   benefit of the bargain.

11   While UIW may be correct from a purely monetary perspective, it ignores the fact

12   that LTP bargained for exclusivity, but did not receive it.  The value of exclusivity is

13   difficult to quantify, so the discount clause works as a type of liquidated damages

14   provision – providing that, if exclusivity is breached, then LTP is entitled to the value of

15   the discount and the startup fees.  If UIW did not want to pay such a large penalty for

16   breaching exclusivity, then it should not have agreed to a contract that expressly stated

17   that the discount was provided as "consideration" for exclusivity.  UIW also complains

18   that none of LTP's other clients actually pay the non-discounted rates, but that is

19   irrelevant, as UIW agreed to the terms of this contract.

20   The court does find it questionable that LTP seeks to recover non-discounted rates

21   for the entire life of the contract, dating back to 2004; however, that issue is not presently

22   before the court.  On this motion, the court's review is limited to whether summary

23   judgment is warranted in UIW's favor based on the argument that LTP has been fully

24   compensated for two of the alleged exclusivity breaches.  And on that issue, the court

25   finds that summary judgment is not warranted.  There remains a triable issue of fact as to

26   whether LTP may recover the non-discounted rates and/or the previously-waived startup

27   costs in case of a breach of the exclusivity clause.

28   Thus, overall, the court finds triable issues of fact regarding all three of the alleged

17

1    exclusivity breaches.  Accordingly, UIW's motion for partial summary judgment is

2    DENIED as to the alleged breaches of section 7.6.

3         2.    Section 5.1 (fee schedule)

4         As to section 5.1 of the Services Agreement, LTP alleges two breaches by UIW:

5    (1) enrolling ADCaP non-blended students in IZIO without paying the per-student rate, (2)

6    allowing ADCaP students to use IZIO for greater than the eight-week period set forth in

7    the agreement.

8         Starting with (1), the court first observes that both parties attempt to support their

9    positions by citing the same email exchange between Vince Porter and Athanasios.  As

10   mentioned in the background section of this order, on December 8, 2011, Dr. Cyndi

11   Porter asked Athanasios if they could have a phone call to "talk about what you are going

12   to do with ADCaP," because Vince Porter was of the belief that UIW "was going to use

13   the portal for the integration not Izio."  Dkt. 53, Ex. P.  Athanasios wrote back to say that

14   LTP was "scrambling to see if we can achieve what Vince likes before this coming

15   quarter," but informing UIW that "[w]hat we have developed in Izio will work for Vince

16   today."  Id.  Athanasios also stated that he "suggested to Vince using the Portal only for

17   the non-blended guys who have no need for Izio otherwise."  Id.  Vince Porter wrote back

18   to say that "using Izio is fine with me," to which Athanasios replied "this is a kind

19   consideration and a good spirit of cooperation Vince."  Id.  Athanasios also said that he

20   would "continue to work towards giving your non-blended students an ability to get their

21   books through the portal," and that he would "come out with a plan tomorrow."

22        Based on that exchange, UIW argues that Athanasios granted permission for all

23   ADCaP students to use IZIO for textbook access, while LTP maintains Athanasios'

24   response stated that IZIO "was fine for ADCaP blended students," but that non-blended

25   students "could continue to use the portal."  Dkt. 53, ¶ 25.

26        The court does find ambiguity in the parties' exchange.  When Athanasios stated

27   that "what we have in Izio will work for Vince today," UIW took that to mean that all

28   ADCaP students (i.e., both blended and non-blended) could use IZIO, whereas LTP

United States District Court
Northern District of California

18

1    claims that he was referring only to blended students, as shown by Athanasios' further

2    statement that he had "suggested to Vince using the Portal only for the non-blended guys

3    who have no need for Izio otherwise."  Both of these interpretations are reasonable.

4         That said, the email exchange does not support LTP's current position that non-

5    blended students "did not have to access their CourseSmart E-books through IZIO"

6    because "their regular Portals worked just fine."  Dkt. 52 at 19.  Athanasios specifically

7    assured the Porters that he would "continue to work towards giving your non-blended

8    students an ability to get their books through the portal," directly implying that the non-

9    blended students could not yet access books through the portal.

10        The court also notes that Athanasios did not follow up on his promise to "come out

11   with a plan tomorrow," and in fact, LTP's own web developer (Andrew Schmidt) says that

12   he was told to stop work on the portal-based solution.  Dkt. 48, ¶ 4.  LTP responds by

13   arguing that it "told Mr. Schmidt to stop working on the CourseSmart module because

14   LTP had not heard back from Mr. Vince Porter about implementation of the module."  Dkt.

15   52 at 19, n. 5.  LTP also claims that the module was "completed, but never was

16   implemented because UIW never responded to LTP's request for a meeting on the

17   matter."  Id. at 19.  However, the "meeting request" that LTP cites to was actually sent on

18   April 10, 2012, well after Athanasios promised on December 11, 2011 to "come out with a

19   plan tomorrow."  Dkt. 53, Ex. Q.  The timeline afterwards is vague, but it does appear that

20   the module was completed at some point, though LTP was slow to test or implement it,

21   despite multiple reminders from Schmidt.  See, e.g., Dkt. 48, ¶¶ 10-13.  LTP did

22   eventually ask UIW for permission to install and test the module, but there is no evidence

23   of that occurring before February 2014 – more than two years after the topic was first

24   broached.  See Dkt. 46, Ex. E.

25        Overall, while the evidence suggests that LTP was slow to provide a portal-based

26   solution for the ADCaP non-blended students, the ambiguity in Athanasios' email to the

27   Porters prevents the court from finding that he granted permission for the non-blended

28   students to use IZIO.  However, UIW asserts an alternate basis for relief – arguing that

LTP "actively facilitated" the non-blended students' use of IZIO by "assisting with or setting up UIW's non-blended courses in IZIO in 2011, 2012, and 2013." Dkt. 44 at 18. UIW argues that this conduct either expressly or impliedly modified the parties' agreement.

LTP responds to the "modification" argument by pointing out that any assistance in setting up the non-blended IZIO courses was provided by Luigi DiGrande, who did not have authority to modify the contract on behalf of LTP.

In reply, UIW asserts that DiGrande "was the Account Manager and UIW's main contact at LTP," and that "UIW necessarily relied on his guidance on how to use LTP's services." Dkt. 58 at 8. However, UIW cites no legal standard regarding the authority of an individual to modify the contract, preventing the court from making a determination as to whether DiGrande had such authority.

In order to modify the contract, DiGrande must have been an agent of LTP acting within the scope of his authority. See, e.g., Penthouse Int'l, Ltd. v. Barnes, 792 F.2d 943, 947-48 (9th Cir. 1986). Issues regarding the existence of agency are questions of fact. Id. at 947. As the party moving for summary judgment, UIW must present evidence showing that there is no triable issue of material fact regarding DiGrande's authority to modify the contract, and UIW's showing falls short of that standard. Accordingly, the court DENIES UIW's motion for partial summary judgment on the section 5.1 claim arising out of the non-blended students' use of IZIO.

Moving to the second alleged breach of section 5.1, UIW argues that there is nothing in the contract limiting the use of IZIO to eight weeks. According to UIW, the contract's reference to "5-8 weeks" is referring to the semester/course length, and places no temporal restrictions on the students' use of IZIO.

> UIW Universe will pay LTP $15 per a student per (5-8 weeks) semester per course for up to 1800 students in any given semester.

> UIW Universe will pay LTP $12 per a student per (5-8 weeks) semester per course for all students above 1800 and up to 2500 in any given semester.

United States District Court
Northern District of California

> UIW Universe will pay LTP $11 per a student per (5-8 weeks) semester per course for all students above 2500 in any given semester.

Complaint, Ex. 1.

However, contrary to UIW's interpretation, the language of the contract does appear to tie each payment to a single student, a single 5-8 week semester, and a single course. Thus, a reasonable factfinder could find that, to the extent IZIO access went beyond a single 5-8 week semester, LTP was owed an additional payment.

Further, to the extent that UIW claims that LTP acquiesced to the longer IZIO access period by virtue of DiGrande's assistance in setting up courses for longer than eight weeks, the court finds that summary judgment is unwarranted for the same reasons discussed above. Thus, the court DENIES UIW's motion for partial summary judgment on the section 5.1 claim arising out of the use of IZIO for greater than eight weeks.

3.      Section 4.3 (restrictions on use of LTP's technology)

Finally, UIW moves for summary judgment as to LTP's section 4.3 claim, which arises out of UIW's adaptation of third-party software to mimic the same functions as LTP's software. The entire dispute revolves around whether UIW's use of the third-party software constituted a "derivative work" of the LTP software.

As a threshold matter, UIW points out that the contract prohibits only the creation of "derivative works from the Software," with "Software" defined in the contract as "LTP's learning platform ('IZIO')." Thus, there was no restriction on creating derivative works from non-IZIO portions of LTP's software, only a restriction on creating a derivative work from IZIO.

It appears undisputed that UIW did adapt third-party software to perform the same functions as LTP's software. UIW's main challenge to this argument is to point to LTP's Rule 30(b)(6) deposition (with Athanasios serving as the deponent), where, according to UIW, Athanasios "admitted that none of these unsupported allegations describe a derivative work." Dkt. 58 at 14.

The deposition transcript is actually not as clear as UIW's characterization indicates. UIW's attorney appears to be asking about four competing products –

21

Blackboard, Banner, Recruiter, and DataTel – and is asking about whether UIW's use of any of them constitutes a derivative work.  With regard to Blackboard, the attorney asks "Do you believe that's a derivative work from IZIO," and Athanasios says "no, that's a derivative work from all our integrated solution."  Dkt. 45, Ex. G at 100:17-24.  Later, the attorney questions him about Banner, asking "but it's not a derivative work of IZIO, correct?", to which he responded "It's a derivative work of our portal and integration facility.  It's a derivative work of the LTP full solution."  Id. at 101:25-102:3.  The attorney further pressed, asking "do you believe it's a derivative work of IZIO itself," to which Athanasios said "I don't know the answer" (his attorney then objected on the grounds that the question called for a legal conclusion).  Id. at 102:10-14.  Finally, UIW's attorney asks about Recruiter, asking "you don't believe it's a derivative work of IZIO specifically, correct?" to which Athanasios responded "correct."  Id. at 104:17-21.

Overall, not only is the deposition testimony muddled, it asks Athanasios to offer legal conclusions.  For those reasons, it cannot serve as the basis for granting summary judgment in UIW's favor.  Other than citing the deposition testimony, UIW offers little else in the way of argument – its motion does not meaningfully engage on the substance of what constitutes a "derivative work," and does not set forth any legal standard nor cite any cases supporting its position.  Overall, the court finds there to be a triable issue of fact as to whether UIW created a "derivative work" of LTP's product, and thus, UIW's motion for summary judgment is DENIED as to the section 4.3 claim.

## CONCLUSION

For the foregoing reasons, UIW's motion for partial summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated:  October 30, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge